**Opinion issued June 30, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00853-CV

———————————

## DERNICK RESOURCES, INC., Appellant

## V.

## DAVID WILSTEIN AND LEONARD WILSTEIN, INDIVIDUALLY AND AS TRUSTEE OF THE LEONARD AND JOYCE WILSTEIN REVOCABLE TRUST, Appellees

---

On Appeal from the 164th District Court
Harris County, Texas
Trial Court Case No. 2002-31310

---

## O P I N I O N

Appellees, David Wilstein and Leonard Wilstein, individually and as trustee

of the Leonard and Joyce Wilstein revocable trust ("the Wilsteins"), sued Dernick

Resources, Inc. ("Dernick") for breach of contract, breach of fiduciary duties,

fraud, and conversion related to the Wilsteins' investment in two different oil and gas leases—the Bradshaw Joint Venture and the McCourt Field Joint Venture. The trial court originally concluded that the Wilsteins' claims for breach of fiduciary duty were barred by the statute of limitations. On appeal, this Court held that Dernick breached its fiduciary duty as a matter of law, that its failure to disclose information necessary for the Wilsteins to discover their injuries tolled the statute of limitations, and that, therefore, the Wilsteins' claims were not time barred. On remand, the trial court ruled that the issues of duty and breach were already established as a matter of law and thus submitted only questions of causation and damages to the jury. The trial court also held a bench trial to address the Wilsteins' claim for fee forfeiture.

In four issues, Dernick argues that (1) the trial court abused its discretion in entering its June 18, 2012 order defining the scope of trial and in instructing the jury that duty and breach had already been determined, based on this Court's prior ruling in this case; (2) the trial court abused its discretion in ordering the fee forfeiture in favor of the Wilsteins; (3) the trial court erred in awarding pre-judgment interest on the fee forfeiture award; and (4) the trial court abused its discretion by awarding excessive attorney's fees.

The Wilsteins, in their cross-appeal, challenge the trial court's decision to disregard the jury's finding of $750,000 in damages regarding revenue generated

by the Bradshaw Joint Venture.  The Wilsteins argue that this award was improper because (1) the Wilsteins' pleadings were sufficient to give Dernick fair notice that they were demanding an accounting of revenues; (2) even if their pleadings were not adequate, Dernick did not suffer any prejudice or surprise; and (3) the evidence was legally sufficient to support the jury's award.

We modify the judgment and affirm as modified.

## Background

The Wilsteins were joint venturers with Dernick under Joint Venture Agreements ("JVAs") for a Nebraska gas field ("the McCourt Field") and a Kansas oil and gas field ("the Bradshaw Field").  *See Dernick Res., Inc. v. Wilstein*, 312 S.W.3d 864, 868 (Tex. App.—Houston [1st Dist.] 2009, no pet.).  The JVAs, which were substantially similar, required any party to give full written notice to the other parties regarding any proposed sale of an interest, the proposed purchase price, and all other terms of the offer.  They also provided that Dernick, who served as the attorney-in-fact for the Wilsteins under both JVAs and as the record title holder, was required to inform the Wilsteins if joint venture assets were sold and to account to them for their share of the proceeds.

Regarding the McCourt Field, Dernick was the attorney in fact and record title holder for both its own 15% interest and the Wilsteins' 10% interest.  In 1996, when the operator of the McCourt Field, Snyder Oil Corporation ("Snyder"),

3

decided to sell its 75% working interest in the McCourt Field, it provided written notice to Dernick as required by the JVA. It offered to sell its interest to Dernick for approximately $3 million in cash. Stephen Dernick, the principal of Dernick, told David Wilstein of the opportunity to participate in the acquisition of Snyder's interest ("the Snyder acquisition") for a cash payment of $3 million. Wilstein told Dernick that the Wilsteins were not interested in making the acquisition. Dernick did not provide any notice of the opportunity to the Wilsteins in writing, in breach of the JVA.

Dernick then pursued other financing options and decided to purchase the Snyder acquisition itself with no cash down using a volumetric production payment ("VPP")[1] which burdened the entire McCourt Field, including the Wilsteins' interest, with an obligation to sell gas produced from the field to the holder of the VPP and with a mortgage to secure the VPP payments. Dernick never informed the Wilsteins in any way of the opportunity to finance the Snyder acquisition with the VPP, and it never informed the Wilsteins that it had burdened their interest in the McCourt Field with the VPP. Furthermore, this purchase made Dernick the owner of the majority interest in the McCourt Field. Dernick named

---

[1] A volumetric production payment agreement is a common oil and gas financing device. *Dernick Res., Inc. v. Wilstein*, 312 S.W.3d 864, 868 n.1 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (citing *EOG Res., Inc. v. Dep't of Revenue*, 86 P.3d 1280, 1282 (Wyo. 2004)). The VPP at issue in this case was entered into between Dernick and Resource Fund, L.P.I. to finance Dernick's purchase of Snyder's interest in the McCourt Field.

its alter ego, Pathex Petroleum, as the field operator and collected more than $15 million in fees pursuant to the McCourt Field Joint Operating Agreement.

Several years later, Dernick decided to repurchase the VPP, thereby un-burdening the gas in the McCourt Field. It again failed to inform the Wilsteins of this change in their interest, and it continued to pay the Wilsteins for their portion of the gas produced from the field at the reduced rate required by the VPP.

Regarding the Bradshaw Field, Dernick sold the entire interest to which it held title in the Bradshaw Field, which necessarily included the portion owned by the Wilsteins because Dernick was the record title holder under the JVA. Dernick failed to disclose the sale to the Wilsteins and failed to provide them with the accounting required by the JVA, but it did record the sale in the Kansas real property records. After the sale, the buyer conveyed back to Dernick an overriding royalty interest. Dernick likewise failed to disclose the existence of the royalty interest to the Wilsteins and failed to provide an accounting for them or otherwise give the Wilsteins their portion of the proceeds.

In October 2003, following the completion of two independent audits, the Wilsteins discovered these breaches of fiduciary duty and joined in litigation that was already pending against Dernick. The Wilsteins asserted claims against Dernick for breach of fiduciary duty and fraud in connection with several acts: (1) Dernick's sale of the Wilsteins' interest in the Bradshaw Field without notice;

5

(2) Dernick's acquisition of the interest of a third party, Snyder, in the McCourt Field by burdening the field with a VPP; and (3) Dernick's repurchase of the VPP and resale of the gas for its own benefit. The Wilsteins also claimed that they had not had notice of the sale of their working interest in the Bradshaw Field, that they had not been given the opportunity to participate in the acquisition of Snyder's interest in the McCourt Field financed with the VPP, and that they had not been notified of the repurchase of the VPP and offered the benefit of the same bargain as Dernick. *Id.* at 873.

## A. The 2005 Bench Trial and the 2006 Jury Trial

In 2005, the trial court held a two-week bench trial on the Wilsteins' claims. It ruled that the Wilsteins' claims for breach of the JVA and breach of fiduciary duty with respect to the Bradshaw Field were barred by limitations because Dernick recorded the sale of their interests in the Bradshaw Field in the Kansas land records in June 1998, which gave the Wilsteins constructive notice of the sale. *Id.* Regarding the Wilsteins' McCourt Field claims, the trial court found that Stephen Dernick's telephone call to David Wilstein fairly informed them of the Snyder acquisition. Accordingly, the trial court ruled that the Wilsteins' complaint that Dernick breached its common law and contractual fiduciary duties by failing to fully and fairly inform them of the opportunity to purchase Snyder's interest in the McCourt Field was likewise barred by the statute of limitations. *Id.* at 876.

6

However, the trial court also found that Dernick's act of burdening the McCourt Field with the VPP "was a breach of the narrow fiduciary duties owed the Wilstein Brothers as the co-owners" of the McCourt Field and that those claims were not barred by limitations, and it allowed the McCourt Field claim dealing with the VPP to proceed to trial. *Id.* at 875.

Following a May 2006 jury trial, the trial court entered judgment in 2007 awarding the Wilsteins $287,400 for losses sustained as a result of the McCourt Field VPP, $13,226 for the difference between the amount that the Wilsteins received for their share of gas produced from the McCourt Field and the amount they should have received, $225,000 in attorney's fees, and $500,000 in exemplary damages (the "2007 judgment"). Dernick appealed the jury's award on the breach of fiduciary duty claim arising out of the McCourt Field VPP and its award of exemplary damages. The Wilsteins appealed the trial court's pre-trial rulings that their claims for breach of fiduciary duty arising out of the acquisition of Snyder's interest in the McCourt Field and the sale of their interest in the Bradshaw Field were barred by the statute of limitations.

## B. The 2009 Appellate Opinion

In a 2009 opinion ("2009 opinion"), a panel of this Court held that, because they were joint venturers and Dernick owed the Wilsteins the fiduciary duties of a joint venturer, the fraudulent concealment doctrine applied to the Wilsteins'

7

claims. *Id.* at 878–79. This Court further held that the Wilsteins' claims were not barred by the statute of limitations. *See id.* at 883, 885. In so holding, we reasoned, "Dernick breached its fiduciary duty to the Wilsteins by failing to disclose its sale of their interest in the Bradshaw Field" and "the Wilsteins were not put on constructive notice of the sale by the filing of the sale in the Kansas public records." *Id.* at 885. Concerning the McCourt Field claim, we concluded that by failing to disclose, "orally or in writing, the opportunity to purchase Snyder's interest by entering a VPP agreement with Resource Fund," Dernick breached the notice requirement of the joint operating agreement and the JVA and, "in doing so, breached its duty of full and fair disclosure to the Wilsteins." *Id.* at 880. Accordingly, we reversed the 2007 judgment on the Wilsteins' appealed claims and remanded the case for further proceedings consistent with our opinion. *See id.* at 886. We overruled Dernick's issues on appeal and affirmed the 2007 judgment as it related to the Wilsteins' breach of fiduciary duty claim arising out of the VPP on the McCourt Field.

## C. The 2012 Mistrial and 2013 Jury and Bench Trials

On remand, the parties filed briefs in the trial court outlining which issues remained to be tried. The trial court entered an order identifying the "issues [that] were remanded by the Court of Appeals for a new trial." The trial court found "that duty and breach of the contractual right to notify in writing and breach of

fiduciary duty are established as a matter of law as to both the McCourt Field and Bradshaw Field. It is therefore, ORDERED that those issues will not be tried." The trial court further ordered that "the only two issues that are ripe for trial are causation and damages as a result of the duty and breach."

Dernick challenged this ruling by mandamus in this Court, and we denied the petition for writ of mandamus. *See In re Dernick Res., Inc.*, No. 01-12-00633-CV, 2012 WL 5878097, at *1 (Tex. App.—Houston [1st Dist.] Nov. 21, 2012, orig. proceeding) (per curiam). Dernick also filed a petition for writ of mandamus in the Texas Supreme Court that was likewise denied.

The case proceeded to trial in February 2012. However, on the third day of that trial, Dernick moved for a mistrial, arguing that the Wilsteins "injected into this case matters that were tried in the first case" and that the trial court had previously ruled that "any issues of double charges were not a matter to be tried in this case." The Wilsteins replied that "this is an accounting and profits trial," so information relevant to whether Dernick double-billed the Wilsteins for certain services was relevant to determining profits and losses. Dernick and the trial court both expressed concern, however, at the prejudicial effect the testimony would have on the jury. Accordingly, the trial judge granted the mistrial, stating that there was "enough question" about her previous rulings regarding what evidence

9

should be admissible to justify a mistrial and that she wanted "to make a nice, clean record."

A second trial on remand was commenced in April 2013. The trial court instructed the jury that the questions of whether Dernick owed a fiduciary duty and whether Dernick had breached that duty with respect to both fields had already been determined as a matter of law. The jury found that the Wilsteins did not sustain any damages as a result of Dernick's breach of fiduciary duty in failing to notify them of the opportunity to acquire Snyder's interest in the McCourt Field. In fact, the jury found that the Wilsteins would have sustained a loss on the past sale from the gas and from fees for the use of the field's gas gathering system. Regarding the Bradshaw Field claim, the jury found that Dernick's failure to notify the Wilsteins about its sale of their interest in the Bradshaw Field and its failure to account to the Wilsteins for their share of the assets of the Bradshaw Joint Venture proximately caused damages in the amount of $162,194.14, representing the Wilsteins' share of the sales proceeds of the Bradshaw Joint Venture, and $750,000, representing the Wilsteins' share of production revenues of the Bradshaw Joint Venture.

Following the jury trial, the trial court held a bench trial on the issue of attorney's fees and on the Wilsteins' claim for an equitable fee forfeiture. The Wilsteins sought forfeiture of all fees paid by them to Pathex, Dernick's alter-ego,

10

as operator of the McCourt Field, based on Dernick's breach of its fiduciary duty in failing to notify the Wilsteins of the opportunity to participate in the Snyder acquisition and Dernick's resultant seizure of the opportunity to become majority owner of the McCourt Field and to name its operator. The trial court found in the Wilsteins' favor on the fee-forfeiture issue and ruled that Dernick should forfeit the fees that it collected as operator of the McCourt Field following the Snyder acquisition. The trial court also determined that the Wilsteins' attorney's fees for prosecuting the Bradshaw Field claim, on which they prevailed and obtained damages, totaled $727,324.82, which was 30% of the reasonable and necessary attorney's fees incurred by the Wilsteins between December 2006 and July 2013.[2]

Dernick subsequently moved to disregard the jury's finding awarding the Wilsteins $750,000 for damages representing the Wilsteins' share of production revenues of the Bradshaw Joint Venture. Dernick argued that the finding must be disregarded because it was unsupported by evidence and because it was immaterial and should never have been submitted due to the Wilsteins' "failure to plead for and disclose such damages." The trial court agreed with Dernick and disregarded that jury finding.

---

[2]    The trial court found that the Wilsteins incurred attorney's fees in the amount of $2,424,416.10 for the prosecution of their lawsuit between December 2006 and July 2013.

The trial court then entered judgment, ordering that the Wilsteins recover the $162,194.14 found by the jury for damages representing the Wilsteins' share of the sales proceeds of the Bradshaw Joint Venture and prejudgment interest on that award; $1,709,421.06 as an "equitable fee forfeiture" and prejudgment interest on that claim; and attorney's fees and costs. Dernick and the Wilsteins both appealed.

## I. DERNICK'S APPEAL

### Scope of Trial

In its first issue, Dernick argues that the trial court erred in limiting the issues tried on remand in 2009 to the issues of causation and damages.

Dernick argues that the trial court abused its discretion in failing to observe and comply with this Court's mandate remanding certain claims for a new trial without limitation and in entering its order identifying the issues for trial as including only the issues of causation and damages. Dernick asserts that the merits of the Wilsteins' claims were never reached, and, thus, it is entitled to a full trial on the merits, including scope of its fiduciary duty, liability, causation, and affirmative defenses. It cites Texas Rule of Civil Procedure 320 and Texas Rule of Appellate Procedure 44.1, both of which provide that a court may not order a separate jury trial solely on the issue of unliquidated damages where liability is also contested. TEX. R. CIV. P. 320; TEX. R. APP. P. 44.1(b). It also cites various cases, such as *Estrada v. Dillon*, which hold that an appellate court may not

remand a case only for the issue of damages where liability is contested. 44 S.W.3d 558, 562 (Tex. 2001) (per curiam).

However, the law cited by Dernick does not prevent the trial court on remand from determining some of those liability issues as a matter of law in light of this Court's previous opinion. *See id.*; *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986) (holding that "courts should look not only to the mandate itself, but also to the opinion of the court" in interpreting mandate of appellate court and determining scope of remand); *Denton Cnty. v. Tarrant Cnty.*, 139 S.W.3d 22, 23 (Tex. App.—Fort Worth 2004, pet. denied) (holding that trial court has reasonable amount of discretion in complying with mandate and may look to mandate itself and appellate court's opinion).

In considering this case on remand, the trial court was bound by the law of the case. *See In re Henry*, 388 S.W.3d 719, 728 (Tex. App.—Houston [1st Dist.] 2012, orig. proceeding). The law of the case doctrine is defined as "that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages." *Loram Maint. Of Way, Inc. v. Ianni*, 210 S.W.3d 593, 596 (Tex. 2006). Accordingly, where the court of appeals' decision is not challenged in the supreme court, the law of the case doctrine ordinarily binds the court of appeals to its initial decision if there is a subsequent appeal in the same case. *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex.

2003). Although a decision rendered on an issue before the appellate court does not absolutely bar re-consideration of the same issue on a second appeal, application of the doctrine lies within the sound discretion of the court, depending on the particular circumstances surrounding that case. *Id.* For example, it is an exception to the general rule that the original rulings govern the case where those rulings were clearly erroneous. *Id.*

Generally, when we reverse and remand a case for further proceedings and the mandate is not limited by special instructions, the effect is to remand the case to the lower court on all issues of fact. *In re Henry*, 388 S.W.3d at 728 (quoting *Simulis, L.L.C. v. Gen. Elec. Capital Corp.*, 392 S.W.3d 729, 734 (Tex. App.— Houston [14th Dist.] 2011, pet. denied)). The law of the case doctrine, by contrast, applies to questions of law and does not apply to questions of fact. *Hudson*, 711 S.W.2d at 630; *In re Henry*, 388 S.W.3d at 728. When, as here, there are no factual questions to resolve, a determination was made as a matter of law, and that determination was not challenged by a petition for review in the supreme court, "the trial court on remand is bound by our previous legal conclusion." *See In re Henry*, 388 S.W.3d at 728.

In our 2009 opinion, we held, as a matter of law, that Dernick owed the Wilsteins contractual and common-law fiduciary duties with regard to both the McCourt Field and the Bradshaw Field. *See Dernick Res.*, 312 S.W.3d at 877–78.

14

We further held that Dernick breached its fiduciary duties to the Wilsteins when it participated in the Snyder acquisition in the McCourt Field without full and fair disclosure to the Wilsteins and when it sold the Wilsteins' interest in the Bradshaw Field without providing them with the required notice. *Id.* at 880, 884. Dernick did not seek review of this opinion in the supreme court. Accordingly, the trial court was bound by our previous legal conclusion that Dernick breached the fiduciary duties it owed the Wilsteins with respect to both fields. *See Hudson*, 711 S.W.2d at 630; *In re Henry*, 388 S.W.3d at 728.

Dernick also argues that the trial court's order determining the scope of issues to be tried presumed liability based on the Wilsteins' Bradshaw Field claims involving a "Horizontal Drilling Program" that were barred by a summary judgment ruling before the 2006 trial proceedings that was not reversed and remanded in the 2009 opinion. However, the record does not support Dernick's contention that issues relating to the Horizontal Drilling Program were retried in 2013. Dernick does not identify any portions of the record where such claims or evidence were erroneously presented to the jury, nor does it point this Court to any place where it objected on this basis in the trial court, as it was required to do to preserve this complaint for review on appeal. *See* TEX. R. APP. P. 33.1(a). Dernick further argues that certain findings of fact from the 2006 trial were erroneous. Again, it does not appear that Dernick presented this argument to the trial court,

15

and it did not challenge those findings of fact during or after its prosecution of its appeal in 2009.  Accordingly, this argument is not preserved for review on appeal. *See id.*

We overrule Dernick's first issue.

## Fee Forfeiture

In its second issue, Dernick complains of the trial court's award of equitable fee forfeiture following the 2013 bench trial, in which the Wilsteins sought forfeiture of the fees they had paid to Dernick's alter ego Pathex as operator of the McCourt Field following Dernick's seizure of the opportunity to become majority owner of the field through the Snyder acquisition without notice to them and its subsequent appointment of Pathex as operator.  The bench trial also addressed the issue of the amount of reasonable and necessary attorney's fees.  This bench trial was conducted after the 2013 trial to the jury on the issues of causation and damages arising from Dernick's breach of its fiduciary duty to provide notice to the Wilsteins of the opportunity to participate in the Snyder acquisition in the McCourt Field. Dernick argues that the Wilsteins did not secure the necessary jury findings or present legally sufficient proof to support an award of equitable fee forfeiture.  It further argues that there is no evidence of a "clear and serious violation" as required for equitable fee forfeiture.  Finally, it argues that the fee forfeiture award is improper because it relates to fees paid under an operating

agreement, for which there was no finding of breach, not the joint venture agreement, and it argues that the fee forfeiture was improper and excessive.

In its third issue, Dernick argues that the trial court erroneously awarded pre-judgment interest on the equitable fee forfeiture award. Dernick contends that the fee forfeiture award was not compensatory in nature, and thus prejudgment interest does not apply.

## A.  Equitable Fee Forfeiture Award

### 1.  *Facts relevant to fee forfeiture award*

In contrast to its claim on appeal that the Wilsteins did not secure the necessary jury findings or present legally sufficient evidence to support an award of equitable fee forfeiture, Dernick argued in pretrial briefing on the claims and issues to be tried on remand that

> [t]he Wilsteins also seek the equitable remedy of disgorgement and fee forfeiture. Because this is an equitable rather than a legal remedy, it should be presented to the Court, not the jury, after the jury renders its verdict on the Wilsteins' limited damage claims. *Burrow v. Arce*, 997 S.W.2d 229, 245 (Tex. 1999) ("Forfeiture of an agent's compensation, we have already explained, is an equitable remedy similar to a constructive trust. As a general rule, a jury does not determine the expediency, necessity, or propriety of equitable relief.") (internal quotations omitted).

Accordingly, the trial court held a bench trial and heard evidence and arguments of counsel on the issue of the Wilsteins' request for equitable fee forfeiture from Dernick regarding fees Dernick received from the Wilsteins as the

17

operator of the McCourt Field. The Wilsteins informed the trial court that there were no facts remaining to be decided and that the amount of the fees had been stipulated to by the parties. Dernick did not object to this characterization of the Wilsteins' claim as a claim for equitable fee forfeiture in a stipulated amount, or did it suggest to the trial court that there were fact questions that needed to be resolved before the court could consider the Wilsteins' fee forfeiture claim.

The Wilsteins presented evidence that Dernick recorded more than $15 million in fees over sixteen years with respect to the McCourt Field and that the Wilsteins themselves paid approximately $1.7 million of those fees. They argued that Dernick received these fees from them as a result of its breach of its fiduciary duty. The Wilsteins pointed to the established facts of the case, as supported by exhibits and testimony that had already been presented to the trial court at various stages in the litigation since 2005: Dernick breached its fiduciary duty in failing to notify the Wilsteins of the opportunity to purchase a controlling interest in the McCourt Field by making the Snyder acquisition; Dernick took for itself the opportunity to purchase the controlling interest in the McCourt Field, thereby allowing it to select its alter ego operating company, Pathex Petroleum, as the successor field operator under the joint operating agreement; Dernick acquired the controlling interest in the McCourt Field by burdening the Wilsteins' interest in that field with a VPP and a mortgage without providing notice to them of that fact;

and Dernick failed to notify the Wilsteins of the opportunity to repurchase the VPP, thereby underpaying them for their share of the gas produced in the McCourt Field during that time period.

The Wilsteins also presented evidence that Dernick misrepresented its ownership of the interest in the McCourt Field to Resource Fund, the party that provided the VPP financing option. And they presented evidence that Stephen Dernick lied when the Wilsteins confronted him about their interests in the McCourt Field: Stephen Dernick told the Wilsteins that their "McCourt Field assets were not utilized to acquire the Snyder interest and were not burdened by the VPP"; Dernick then refused to continue to market and sell the Wilsteins' share of the gas from the McCourt Field, and Pathex, Dernick's alter ego, threatened to discontinue insurance coverage on the Wilsteins' portion of the McCourt Field interest. The Wilsteins argued that these acts constituted a clear and serious violation of Dernick's fiduciary duty to them and required it to forfeit the fees that the Wilsteins had paid for the operation of the McCourt Field during the relevant time period.

Dernick did not object to any of this evidence or otherwise argue to the trial court that the form of the Wilsteins' evidence, comprised of documents and testimony excerpts from the previous trials and other proceedings, was in any way inadequate or erroneous.

Dernick argued instead that all of the Wilsteins' claims about wrongdoing related to the VPP and were fully tried in 2006. Dernick pointed out that the 2006 jury awarded the Wilsteins $13,226 in damages based on the underpayment for gas, and, Dernick argued, the Wilsteins received $500,000 in punitive damages for breach of the fiduciary duty relating to the VPP. Dernick argued that the Wilsteins did not seek fee forfeiture at that time on the claim that Dernick breached its fiduciary duty with regard to the VPP, and, thus, it contended, they could not seek fee forfeiture on their claim that Dernick breached its fiduciary duty by failing to inform them of the opportunity to purchase Snyder's interest in the McCourt Field. Dernick argued that the Wilsteins were not entitled to fee forfeiture because they were not allowed to "re-try the 2006 case."

Dernick presented evidence that the McCourt Field was not a successful investment, in terms of profitability, and therefore the Wilsteins could not show that they were harmed by Dernick's failure to allow them to participate in acquiring a majority interest in that field. Dernick relied, in part, on the jury's finding that if the Wilsteins had participated in the acquisition of Snyder's interest they would have lost money.

Dernick also argued that the breach was not particularly grave—Dernick informed the Wilsteins about the opportunity to acquire Snyder's interest on the phone, and it did not tell the Wilsteins about the VPP financing method because it

20

was expensive and high risk, and Dernick did not think they would be interested. Dernick also relied on testimony and documents that had been admitted in previous proceedings, including the 2006 bench trial and the 2013 trial to the jury underlying the present appeal. Dernick argued that in discussing the Snyder acquisition on the phone Stephen Dernick was simply following the course of conduct that had developed between the parties over the years, and thus Dernick's failure to inform the Wilsteins in writing of the opportunity to acquire a portion of Snyder's interest in the McCourt Field was not intentional or negligent.

The evidence demonstrated that Snyder was originally the operator of the McCourt Field. Once Dernick purchased Snyder's interest, it was able to name a new operator under the terms of the joint operating agreement. Dernick named its alter ego, Pathex Petroleum, as the operator and was paid approximately $15 million in fees in that capacity during the relevant time period. The Wilsteins sought forfeiture of the portion of those fees—approximately $1.7 million—that they had paid to Dernick under the joint operating agreement. Dernick argued that there was no evidence that it failed to properly manage the McCourt Field and there was no breach of fiduciary duty or mismanagement of any kind relating to the fees the Wilsteins paid to Dernick to operate the McCourt Field. Stated another way, Dernick argued that the fees the Wilsteins wanted Dernick to forfeit were unconnected to its breach in failing to give notice of the opportunity to buy

Snyder's interest in the McCourt Field because the fees were charged under the joint operating agreement, but its fiduciary duty was set out in the joint venture agreement. Thus, Dernick argued, the breach was not central to the scope of the fiduciary relationship.

Following this bench trial, the trial court made several relevant findings of fact:

> 4. Dernick's breach of fiduciary duties concerning the McCourt Field Joint Venture Agreement and Joint Operating Agreement gave it control of the McCourt Field and allowed it to appoint its alter ego, Pathex Petroleum, Inc. ("Pathex"), as the field operator to charge fees per well [including operator fees, and fees for the use of the Gas Gathering System and Salt Water Disposal System].
>
> 5. Without Dernick's breach of fiduciary duties concerning the McCourt Field [JVA and JOA], Dernick would not have been entitled to receive any of the fees at issue.
>
> . . . .
>
> 7. Dernick's conduct on which fee forfeiture is based was deliberate and intentional; not merely negligent.
>
> . . . .
>
> 10. Because Dernick's right to charge and collect certain fees from the Wilstein Brothers arose by virtue of Dernick's breach of fiduciary duty, equity dictates that Dernick may not retain such benefits.
>
> . . . .
>
> 16. Dernick's conduct constituted a clear and serious breach of fiduciary duty. . . .

17. The Court considered the seriousness of the violation, including the gravity and timing of the violation, its willfulness, its effect on the value of Dernick's work for the Wilsteins, other threatened or actual harm to the Wilsteins, and the adequacy of other remedies. . . .

The trial court also found that the parties stipulated to the amount of fees charged and collected by Dernick as operator of the McCourt Field over the relevant time period—between January 1997, when it took over as operator, and March 2013. The trial court found that Dernick charged and collected over $15 million in fees as the operator of the McCourt Field under the JOA and as the owner and operator of the Gas Gathering System and Salt Water Disposal System. The trial court further found that the Wilsteins paid $764,286.15 for the field operations of the McCourt Field under the terms of the JOA, $818,472.29 for the Gas Gathering System of the McCourt Field, and $126,662.61 for the Salt Water Disposal System of the McCourt Field. The trial court concluded that the Wilsteins "should recover $1,709,421.05 from [Dernick] for equitable fee forfeiture as a result of Dernick's clear and serious breach of fiduciary duties under the McCourt Field [JVA and JOA]."

The trial court's judgment ordered that the each of the Wilsteins recover $854,710.53, for a total of $1,709,421.06, in "equitable fee forfeiture," plus five percent prejudgment interest on that award, based on its findings and conclusions following the bench trial.

## 2. *Standard of review and law of fee forfeiture*

Courts may fashion equitable remedies such as profit disgorgement and fee forfeiture to remedy a breach of a fiduciary duty. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010); *see also Burrow*, 997 S.W.2d at 237 ("[A]s a rule a person who renders service to another in a relationship of trust may be denied compensation for his service if he breaches that trust."). The primary purpose of fee forfeiture as an equitable remedy is not to compensate the injured principal, but to protect relationships of trust by discouraging disloyalty. *Swinnea*, 318 S.W.3d at 872–73 (quoting *Burrow*, 997 S.W.2d at 238). Forfeiture is not justified in every instance in which a fiduciary violates a legal duty because some violations are inadvertent or do not significantly harm the principal. *Burrow*, 997 S.W.2d at 241 (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 49 cmt. b (1996)); *Miller v. Kennedy & Minshew, Prof'l Corp.*, 142 S.W.3d 325, 338 (Tex. App.—Fort Worth 2003, pet. denied). The remedy of fee forfeiture is only available for "clear and serious" violations of a fiduciary duty. *Burrow*, 997 S.W.2d at 241; *Miller*, 142 S.W.3d at 338.

"Whether a fee forfeiture should be imposed must be determined by the trial court based on the equity of the circumstances." *Miller*, 142 S.W.3d at 338; *see also Burrow*, 997 S.W.2d at 245 ("As a general rule, a jury 'does not determine the expediency, necessity, or propriety of equitable relief.'") (quoting *State v. Tex. Pet*

*Foods, Inc.*, 591 S.W.2d 800, 803 (Tex. 1979)). However, certain matters—such as whether or when the alleged misconduct occurred, the fiduciary's mental state and culpability, the value of the fiduciary's services, and the existence and amount of harm to the principal—may present fact issues for the jury to decide. *Burrow*, 997 S.W.2d at 246; *Miller*, 142 S.W.3d at 338. Once the factual disputes have been resolved, the trial court must determine whether the fiduciary's conduct was a clear and serious breach of duty to the principal, whether any of the fees should be forfeited, and if so, what the amount should be. *Burrow*, 997 S.W.2d at 245–46; *Miller*, 142 S.W.3d at 338.

The remedy of forfeiture must fit the circumstances presented. *Swinnea*, 318 S.W.3d at 874. The trial court should consider factors such as the gravity and timing of the breach, the level of intent or fault, whether the principal received any benefit from the fiduciary despite the breach, the centrality of the breach to the scope of the fiduciary relationship, any other threatened or actual harm to the principal, the adequacy of other remedies, and whether forfeiture "fit[s] the circumstances and work[s] to serve the ultimate goal of protecting relationships of trust." *Id.* at 875; *see Burrow*, 997 S.W.2d at 243–46; *Miller*, 142 S.W.3d at 338–39.

We review the trial court's fee forfeiture determination for an abuse of discretion. *Miller*, 142 S.W.3d at 339 (citing *Burrow*, 997 S.W.2d at 243 ("It is

within the discretion of the court whether the trustee who has committed a breach of trust shall receive full compensation or whether his compensation shall be reduced or denied.")). A trial court abuses its discretion if it acts arbitrarily or unreasonably, without reference to any guiding rules or principles. *Id.* Legal and factual sufficiency are relevant factors to be considered in assessing whether the trial court abused its discretion. *Id.* (citing *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991)). However, an abuse of discretion does not occur when the trial court bases its decision on conflicting evidence, as long as some evidence reasonably supports the trial court's decision. *Id.* (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002)).

### 3. *Analysis*

Dernick argues that the trial court abused its discretion in awarding fee forfeiture of the fees the Wilsteins had paid to Pathex, Dernick's alter ego, as a result of Dernick's seizure of the opportunity to acquire a majority interest in the McCourt Field and appoint Pathex as operator because the Wilsteins did not obtain the necessary jury findings as a predicate for finding such equitable relief. However, Dernick did not preserve this issue, as no such objection was made in the trial court. *See* TEX. R. APP. P. 33.1(a). Furthermore, Dernick affirmatively argued in its pretrial briefing that the issue of equitable fee forfeiture had to be presented to the trial court in a bench trial following the jury trial and should not be presented

26

to the jury. Thus, this case is distinguishable from the case relied upon by Dernick, *Dallas Fire Insurance Co. v. Texas Contractors Surety & Casualty Agency*, which held that the plaintiff could not seek equitable fee forfeiture because it did not establish that the breach of fiduciary duty caused damages and it failed to obtain jury findings regarding whether the agents acted intentionally, with gross negligence, or recklessly, and regarding the value of the agents' services. *See* 128 S.W.3d 279, 303 (Tex. App.—Fort Worth 2004), *reversed on other grounds*, 159 S.W.3d 895 (Tex. 2004).

At the 2013 bench trial, the parties represented that all fact issues had been resolved, either by this Court in the 2009 opinion or in the 2013 jury trial on remand. The Wilsteins presented evidence of a stipulation between themselves and Dernick regarding the amounts of fees paid by the Wilsteins to Pathex as operator of the McCourt Field. The only question left to be answered was whether Dernick's breach of its fiduciary duty by seizing the opportunity to purchase the majority interest in the McCourt Field and appoint Pathex as operator was "clear and serious" so as to justify equitable fee forfeiture and, if so, what amount of fees should be forfeited. These are questions that are properly determined by the trial court. *See Burrow*, 997 S.W.2d at 245–46; *Miller*, 142 S.W.3d at 338.

Dernick also argues the evidence was legally insufficient to support equitable fee forfeiture because there was no evidence of a clear and serious

27

violation of fiduciary duty. Dernick argues on appeal that "the Wilsteins' complaint for [the McCourt Field] boils down to a technical complaint that an oral notice should have been put in writing and that the Wilsteins should have been advised of financing opportunities that they would not have used."

However, the record contradicts this view of the evidence. Dernick acted as the attorney in fact and record title holder for both its own and the Wilsteins' interest in the McCourt field. As the Wilsteins' joint venture partner, Dernick owed the Wilsteins a duty to provide written notice of the opportunity to participate in the Snyder acquisition, but it failed to perform this duty. The Wilsteins point to evidence that they would have been interested in acquiring Snyder's interest in the McCourt Field using the VPP financing option. The evidence also establishes that Dernick informed David Wilstein over the phone—not in writing—of the opportunity to purchase Snyder's interest for a cash payment. Stephen Dernick admitted that he never informed the Wilsteins of the opportunity to participate in the Snyder acquisition using the VPP as a financing tool.

The Wilsteins further argue, and produced evidence, that Dernick's acquisition of Snyder's interest without giving them the full and written notice required by their JVA made Dernick the majority owner of the McCourt Field. Dernick's majority-owner status allowed it to name itself, via its alter-ego Pathex,

as operator of the McCourt Field and to charge approximately $15 million in operation fees under the McCourt Field Joint Operating Agreement. Dernick's failure was not a "technical complaint." Its failure to satisfy its fiduciary duty under the JVA resulted in Dernick's having an opportunity to enrich itself at the expense of its principal, the Wilsteins. Accordingly, there is evidence that the breach of fiduciary duty was serious and grave. *See Burrow*, 997 S.W.2d at 243 (stating that gravity of violation is factor to consider in determining whether fee forfeiture is appropriate).

Furthermore, there was evidence that Dernick's breach of its fiduciary duty in failing to notify the Wilsteins in writing of the opportunity to make the Snyder acquisition, and its seizure of the opportunity to become majority owner and appoint the operator of the field, was not a single limited, "technical" failure arising from the parties' business practice, as Dernick argues. Rather, it was part of repeated conduct on Dernick's part that involved concealing or failing to disclose information it was required to disclose, using the Wilsteins' interest to enrich itself, and threatening further harm to the Wilsteins' interest in the field. Thus, there is evidence that the violation had repercussions that were felt by the Wilsteins over a period of years, from 1997 until the time of trial in 2013, and that it was willful.

Dernick also argues that the trial court erred in considering evidence relevant to its breach of fiduciary duties with regard to the burdening of the Wilsteins' interest in the McCourt Field with a VPP because the burdening of the field with the VPP had already been considered by the jury in the 2006 jury trial; the jury had awarded the Wilsteins damages, including exemplary damages; and that judgment had been paid. However, the 2007 judgment awarded the Wilsteins only their actual losses for the difference between their share of the gas produced from the McCourt Field and what they would have received had it not been improperly burdened by the VPP plus exemplary damages for Dernick's breach of its fiduciary duty solely with respect to its burdening the field with the VPP. It did not consider the effect on the Wilsteins' interests of Dernick's seizure of the opportunity to purchase a majority interest in the McCourt Field without giving notice of the opportunity to the Wilsteins and its subsequent appointment of its alter ego Pathex as operator, which enabled it to enrich itself by millions of dollars in fees. These claims were not heard in the 2006 trial because the trial court had held prior to that trial that the Wilsteins' damage claims arising from Dernick's failure to give notice of the opportunity to make the Snyder acquisition were barred by limitations. This Court heard and reversed that determination in the 2009 opinion on appeal, and those claims were not tried until 2013.

This appeal arises solely from the issues tried in 2013. The 2013 jury awarded no damages for lost gas sales on the McCourt Field, and the question of equitable fee forfeiture of the fees paid by the Wilsteins to Pathex as operator of the McCourt Field after Dernick's purchase of the majority interest in the field without notice to the Wilsteins was tried to the bench. It is that award which Dernick now appeals. Evidence of all of Dernick's breaches of fiduciary duty and bad acts was relevant to establish the Wilsteins' entitlement to equitable forfeiture of the fees Dernick received as operator for the McCourt Field. Evidence of Dernick's intent to breach its duty to give notice to the Wilsteins of the opportunity to purchase the majority interest in the McCourt Field, evidence of Dernick's purchase of that interest following its failure to given notice, evidence of its appointment of its alter ego Pathex as operator, and evidence of the millions of dollars in fees Dernick, through Pathex, charged the Wilsteins in its capacity as operator of the field after the purchase were all material to the establishment of the Wilsteins' right to equitable fee forfeiture of the fees they paid to Dernick as operator of the McCourt Field. Dernick's pattern of abuse of the fiduciary relationship demonstrated that its failure under the McCourt Field JVA with regard to the Snyder acquisition was not an innocent mistake on Dernick's part, but rather part of its repeated pattern of behavior to use the Wilsteins' trust in it as a fiduciary

to enrich itself in its capacity as operator of the field. *See id.* (stating that intent behind breach of trust is factor relating to propriety of fee forfeiture).

Dernick also argues that forfeiture of fees collected under the operating agreement was not permissible for claimed breaches of the joint venture agreement, as opposed to the joint operating agreement. Dernick cites *Gregory v. Porter & Hedges, LLP*, 398 S.W.3d 881 (Tex. App.—Houston [14th Dist.] 2013, pet. denied), for the proposition that fee forfeiture is not permitted for a separate agreement for which there is no breach finding. In *Gregory*, our sister court of appeals held that a former client seeking forfeiture of attorney's fees was not entitled to recover fees paid by a third party. *Id.* at 886. In *Gregory*, the client sought forfeiture of attorney's fees paid during the second occasion on which the law firm provided legal representation. *Id.* The court observed that the former client and the attorneys "had two distinct attorney-client relationships," that it was undisputed that the attorneys fully performed all of their obligations under the first attorney-client relationship, and that all of the client's claims arose out of the second representation, for which the client never paid any fees. *Id.* at 886–87. Because the client had paid no fees related to the second representation, she could not seek the forfeiture of any fees. *Id.* at 887.

Here, in contrast, the Wilsteins are seeking forfeiture of the fees that they themselves paid to Pathex for the operation of the McCourt Field following the

Snyder acquisition—fees that Dernick was able to collect only because of its breach of its fiduciary duty to the Wilsteins under the joint venture agreement. The circumstances in *Gregory* are thus clearly distinguishable from those in the present case. As stated above, Dernick's acquisition of Snyder's interest without giving the Wilsteins the full and fair written notice required by their JVA enabled Dernick to become the majority owner of the McCourt Field, which allowed Dernick to appoint itself in its alter ego capacity as the operator of the McCourt Field and thereby to collect millions of dollars in operating fees under the Joint Operating Agreement. The Wilsteins sought the forfeiture of the fees they paid to Dernick as a result of Dernick's breach of the JVA.

Finally, Dernick argues that the amount of the fee forfeiture was excessive. Dernick complains that the trial court abused its discretion in awarding "total fee forfeiture, despite the jury's finding that the Wilsteins suffered no damages, and, in fact, avoided additional losses by not participating in the Snyder acquisition." We observe that the parties stipulated, and the trial court found, that Dernick collected over $15 million in fees as the operator of the McCourt Field and that the Wilsteins paid more than $1.7 million of those fees.

Although it is true that total fee forfeiture is not always appropriate, the supreme court has held, "Ordinarily, forfeiture extends to all fees for the matter for which the [fiduciary] was retained." *Burrow*, 997 S.W.2d at 241 (quoting

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, § 49 cmt. e); *see also*

*Swinnea*, 318 S.W.3d at 873 ("[C]ourts may disgorge all ill-gotten profits from a

fiduciary when a fiduciary agent usurps an opportunity properly belonging to a

principal, or competes with a principal."). As an example of when total fee

forfeiture is not appropriate, the supreme court has cited a circumstance such as

"when a lawyer performed valuable services before the misconduct began, and the

misconduct was not so grave as to require forfeiture of the fee for all services."

*Burrow*, 997 S.W.2d at 241 (quoting RESTATEMENT (THIRD) OF THE LAW

GOVERNING LAWYERS, § 49 cmt. e). It stated that "[s]ome violations are

inadvertent or do not significantly harm the client" and can "be adequately dealt

with by . . . a partial forfeiture." *Id.* (quoting RESTATEMENT (THIRD) OF THE LAW

GOVERNING LAWYERS, § 49 cmt. b). Ultimately, fee forfeiture must be applied

with discretion, based on all of the circumstances of the case. *Id.* at 241–42;

*Swinnea*, 318 S.W.3d at 874–75.

As discussed above, the breach of fiduciary duty in this case cannot be

described as "inadvertent." Dernick failed to provide a full and fair disclosure of

the opportunity to participate in the Snyder acquisition to the Wilsteins and instead

took the opportunity solely unto itself. Dernick was able to acquire a majority

interest in the McCourt Field, name itself the operator, and proceed to collect fees

from the Wilsteins. Although Dernick argues that it provided valuable services

that the Wilsteins would have been required to pay for in any event, we observe that Dernick's ability to charge all of those fees was the direct result of its misconduct. Dernick usurped an opportunity properly belonging to the Wilsteins and was enriched because of that breach. Thus, this is the type of violation for which total fee forfeiture is appropriate. *See Swinnea*, 318 S.W.3d at 873; *Burrow*, 997 S.W.2d at 241.

Furthermore, Dernick's argument that the Wilsteins should not be entitled to receive an equitable remedy because the jury failed to award it a legal remedy is unavailing. As the supreme court held in *Burrow*, "Even though the main purpose of the remedy is not to compensate the client, if other remedies do not afford the client full compensation for his damages, forfeiture may be considered for that purpose." 997 S.W.2d at 244. Thus, the purpose of the fee forfeiture is not to compensate the Wilsteins for financial loss related to the lost opportunity to participate in the Snyder acquisition—it is to protect the fiduciary relationship. And, it is precisely for situations such as the one here—where traditional legal remedies do not adequately compensate for the loss of trust in the fiduciary relationship—that fee forfeiture "may be considered for that purpose." *See Swinnea*, 318 S.W.3d at 874; *see also Russell v. Truitt*, 554 S.W.2d 948, 953 (Tex. Civ. App.—Fort Worth 1977, writ ref'd n.r.e.) (upholding total fee forfeiture, reasoning that "[a]lthough the alleged secret agreement may have put [the

defendant] in a better position to look after the interests of the plaintiffs it also put the defendants in a position to make an additional profit which plaintiffs would not share").

We overrule Dernick's second issue.

## B.    Prejudgment Interest on Equitable Fee Forfeiture

In its third issue, Dernick argues that the trial court erred in awarding prejudgment interest on the fee forfeiture award.  The Wilsteins argue that the trial court's award of prejudgment interest was not an abuse of discretion but was instead "consistent with the purposes of prejudgment interest."  They assert that the award of prejudgment interest on the fee forfeiture was appropriate because it served to encourage settlement and discourage Dernick's delay.

We review a trial court's decision regarding the award of prejudgment interest for an abuse of discretion, giving only limited deference to the trial court's application of the law to the facts.  *Purcell Constr., Inc. v. Welch*, 17 S.W.3d 398, 402 (Tex. App.—Houston [1st Dist.] 2000, no pet.).

Prejudgment interest is compensation for the lost use of money owed as damages.  *Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 809, 812 (Tex. 2006) (holding that prejudgment interest is awarded to fully compensate injured party, not to punish defendant); *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998) (stating that decision to extend prejudgment

36

interest recovery to personal injury, wrongful death, and survival actions was "driven primarily by the rationale that awarding prejudgment interest was necessary to fully compensate injured plaintiffs"). Awarding prejudgment interest serves two purposes: (1) encouraging settlement and (2) expediting settlements and trials by removing incentives for defendants to delay without creating such incentives for plaintiffs. *Johnson & Higgins*, 962 S.W.2d at 529.

An award of prejudgment interest may be based either on an enabling statute or on general principles of equity. *Johnson & Higgins*, 962 S.W.2d at 528. Here, the Wilsteins sought prejudgment interest on the fee forfeiture award based on principles of equity, arguing that Dernick ought not to benefit from its protracted litigation and delayed forfeiture of its wrongly-acquired fees. Here, there is no statute enabling the recovery of prejudgment interest for a breach of fiduciary duty such as the one asserted by the Wilsteins. *Cf.* TEX. FIN. CODE ANN. § 304.102 (Vernon 2006) ("A judgment in a wrongful death, personal injury, or property damage case earns prejudgment interest."). However, the supreme court has held that awards of prejudgment interest may be based on "general principles of equity" and that when no statute controls the parties must look to equitable considerations to support an award of prejudgment interest. *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex. 1985). Thus, when, as here, no statute controls the award of prejudgment interest, the decision to award prejudgment interest is

37

left to the sound discretion of the trial court, which should rely upon equitable principles and public policy in making its decision. *Henry v. Masson*, 453 S.W.3d 43, 2014 WL 6678937, at \*5 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (citing *Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 487 (Tex. App.—Fort Worth 2004, no pet.), and *Purcell Constr.*, 17 S.W.3d at 402).

In examining the general principles of equity implicated in this case, we conclude that the trial court did not abuse its discretion in awarding prejudgment interest on the fee forfeiture award. The trial court awarded the fee forfeiture, including prejudgment interest on that amount, based on its findings and conclusions regarding the nature and severity of Dernick's breach of its fiduciary duty to the Wilsteins and the amount of fees that it would not have collected but for its breach. The trial court found that Dernick's "clear and serious" breach of its fiduciary duty to the Wilsteins was "intentional and deliberate." It further found that "Dernick's right to charge and collect the fees . . . arose by virtue of [its] breach of fiduciary duty" and thus, "equity dictates that Dernick may not retain such benefit."

Not only did Dernick commit a "clear and serious" breach of its fiduciary duty to the Wilsteins, it then engaged in protracted litigation—dating back to 2003—to avoid facing the consequences of that breach. The trial court's ruling here thus served an essential equitable function of prejudgment interest—to

encourage settlement and discourage delay by removing incentives for defendants such as Dernick to use lengthy legal proceedings to avoid its obligations as a fiduciary. *See Johnson & Higgins*, 962 S.W.2d at 529.

Furthermore, the trial court's grant of prejudgment interest on the fee forfeiture award served to award the injured party—the Wilsteins—the use of the forfeited money for the time its claims were being litigated. We have already upheld the trial court's determination that equity dictated that Dernick forfeit the fees it collected from the Wilsteins as a result of its breach of fiduciary duty. It was likewise appropriate for the trial court to conclude that Dernick should not retain the benefit of the use of the fees it was eventually ordered to forfeit during the protracted litigation and that, instead, the Wilsteins were entitled to that benefit. *See Johnson & Higgins*, 962 S.W.2d at 528–29 (holding that prejudgment interest is compensation for lost use of money due as damages and that prejudgment interest serves dual purposes of encouraging settlement and discouraging delay); *see also Swinnea*, 318 S.W.3d at 881 (holding, in context of equitable forfeiture of contractual consideration, that "the rule allowing such equitable remedies to protect relationships of trust encompasses the ability to fashion such remedies against those who would conspire to abuse such relationships").

Dernick, however, argues that prejudgment interest is available only for compensatory damages and that, because the fee forfeiture award did not constitute

compensatory damages, prejudgment interest should not be available on that award. We first observe that the supreme court has never held that prejudgment interest is available only on compensatory damages, and its holding on equitable fee forfeiture indicates otherwise. Moreover, Dernick does not cite, and we could not find, any cases in which the supreme court has prohibited awards of prejudgment interest on equitable remedies such as the fee forfeiture here. *Cf. Brainard*, 216 S.W.3d at 812 (holding that prejudgment interest is intended to fully compensate injured party, not to punish defendant, and stating, "We have consistently viewed prejudgment interest as falling within the common law meaning of damages"); *Johnson & Higgins*, 962 S.W.2d at 528–29 (purpose of prejudgment interest is to fully compensate plaintiff for lost use of money due as compensation).

We note that the supreme court has carefully distinguished those types of damages for which prejudgment interest is not available—damages that do not apply here. *See Cavnar*, 696 S.W.2d at 555 (holding that prejudgment interest is not available on punitive damages or future damages); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 41.007 (Vernon 2015) ("Prejudgment interest may not be assessed or recovered on an award of exemplary damages."). Dernick relied on similar reasoning in arguing that the trial court did not abuse its discretion in excluding the fee forfeiture award when it calculated the amount of the

supersedeas bond required for Dernick to pursue its appeal. In that instance, we agreed with Dernick and held that for purposes of setting the amount of the supersedeas bond, the fee forfeiture award "was not primarily intended to compensate the Wilsteins, but to protect relationships of trust by deterring Dernick from breaching its fiduciary duties." However, based on our analysis of all of the equitable principles involved here and the underlying purposes of awards of prejudgment interest, as discussed above, we cannot conclude that the trial court abused its discretion in awarding the Wilsteins prejudgment interest on the fee forfeiture award.

We overrule Dernick's third issue.

### Attorney's Fees

In its fourth issue, Dernick argues that the attorney's fees awarded on the Wilsteins' Bradshaw Field claim were excessive.

### A.      Relevant Facts

Following the jury trial, the trial court held a bench trial on the issue of attorney's fees. The Wilsteins presented evidence in the form of invoices, summaries, and other documents, in addition to the testimony of its attorneys.

The Wilsteins' appellate attorney, who also testified as an expert on attorney's fees, stated that the Wilsteins segregated their attorney's fees so that only the fees necessary to the litigation of the Bradshaw Field claim against

41

Dernick were presented. The attorney testified to the method he used to determine what portion of the work was allocated to the Bradshaw Field claim—the attorneys eliminated any work that was specifically related to an unrecoverable claim, such as those arising out of the McCourt Field claims. Of the remaining fees invoiced to the Wilsteins, the attorneys "perform[ed] an allocation based upon the type of work that was being done and how much of that work, if any, would have been avoided if the non-recoverable claim had not been pursued." The attorney testified that some portions of the work, such as reading the record from the trial, would still have been 100% necessary even if the non-recoverable claim had not been pursued. Also, both the recoverable and non-recoverable claims were based on similar contracts with similar legal theories, so some of the broader research applied 100% to the recoverable claim. Other portions of the work, such as preparing briefing and preparing for oral argument, required that the attorney determine what portion of that time was dedicated solely to the recoverable claim. In total, the amount the attorney allocated to the recoverable claims was approximately 62% of the total billing.

The attorney likewise testified about the nature of the work done on the case, the attorneys and paralegals who worked on the case, their professional qualifications, and their billable rates.

The attorney acknowledged that the attorney's fees incurred in the case were higher than usual, but he testified that the high fees were due to the unusual nature of the case. The fees were incurred over a period ranging from 2006, following the first jury trial, until the 2013 trial underlying this appeal. He also testified that Dernick's strategy of repeatedly challenging the trial court's implementation of the 2009 opinion and mandate caused a lot of the fees: the "$466,000 figure—had the parties simply prepared the case and gone to trial, that figure would have $200,000 less, but for the argument that the defendant decided to make" regarding the interpretation of the 2009 opinion and mandate and the scope of issues for trial on remand. The attorney testified that, between the issuance of this Court's judgment in the 2009 appeal and the start of the 2013 trial on remand, Dernick filed several motions and emergency motions in this Court, including a motion to stay, and Dernick also filed a mandamus to this Court and a mandamus to the supreme court, both of which required prompt responses and were more costly than work that can be done "at a slower pace." These proceedings that occurred between the original appeal and the trial on remand also created additional expenses for "trials that didn't go forward, trial settings that got blown, the necessity of the mistrial, [and] preparing for trials that didn't happen," all of which added to the legal fees incurred in this case.

Ultimately, the trial court found that the Wilsteins' reasonable and necessary attorney's fees for the entire case, from 2006 until the time of the underlying trial in 2013 were $2,424,416.10. The trial court found that the Wilsteins properly segregated their fees to include only the fees incurred in litigating their recoverable claim—the Bradshaw Field claim—and awarded them $727,324.82, or thirty percent of their total fees.

## B. Standard of Review on Attorney's Fees

The prevailing party in a breach of contract suit is entitled to attorney's fees. TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (Vernon 2015); *Haden v. David J. Sacks, P.C.*, 332 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). An award of attorney's fees must be supported by evidence that the fees are reasonable and necessary. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991). A trial court determines the reasonableness of an attorney's fees award by considering the factors enumerated in *Arthur Andersen & Co. v. Perry Equipment Corp.* 945 S.W.2d 812, 818 (Tex. 1997) (holding that evidence of contingency fee agreement alone does not support award of reasonable and necessary attorney's fees and that trial court must still consider other factors). The reasonableness of attorney's fees is generally a fact issue. *Haden*, 332 S.W.3d at 512. We review attorney's fees awards for an abuse of discretion. *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 163 (Tex. 2004).

Regarding the amount of attorney's fees, the party applying for the award bears the burden of proof. *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 762–63 (Tex. 2012). In *El Apple I*, the supreme court stated:

> That proof should include the basic facts underlying the lodestar, which are: (1) the nature of the work, (2) who performed the services and their rate, (3) approximately when the services were performed, and (4) the number of hours worked. An attorney could, of course, testify to these details, but in all but the simplest cases, the attorney would probably have to refer to some type of record or documentation to provide this information.

*Id.* at 763. Thus, the supreme court held that, when applying for a fee under the lodestar method, "the applicant must provide sufficient details of the work performed before the court can make a meaningful review of the fee request" and that such evidence includes "documentation of the services performed, who performed them and at what hourly rate, when they were performed, and how much time the work required." *Id.* at 764.

Furthermore, attorney's fee "claimants have always been required to segregate fees between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006) (citing *Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 73 (Tex. 1997)). However, the supreme court has recognized a narrow exception "when discrete legal services advance both a recoverable and unrecoverable claim" and thus "are so intertwined that they need not be segregated." *Id.* at 313–14. The court stated:

45

This standard does not require more precise proof for attorney's fees than for any other claims or expenses. Here, Chapa's attorneys did not have to keep separate time records when they drafted the fraud, contract, or DTPA paragraphs of her petition; an opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no fraud claim. The court of appeals could then have applied standard factual and legal sufficiency review to the jury's verdict based on that evidence.

*Id.* at 314.

## C.    Analysis

Dernick complains about the amount of attorney's fees awarded here, arguing that they were excessive and not supported by the record. Specifically, it argues that the Wilsteins were only entitled to recover fees based on their claim for breach of contract for the Bradshaw Field, for which they recovered approximately $162,000 in damages. Thus, the attorney's fees award was almost five times more than the damages the Wilsteins recovered.[3]

However, it is undisputed that the Wilsteins recovered damages on their claim of breach of contract. Thus, Dernick's argument can only be interpreted as a complaint that the Wilsteins did not segregate their fees regarding the different measures of damages presented to the jury on that single Bradshaw Field claim. Dernick made no such complaint in the trial court, and accordingly, it is waived.

---

[3]    Dernick also argues that the Wilsteins' presentation on fees related to the jury award that the trial court subsequently disregarded—the $750,000 in damages representing the Wilsteins' share of production revenues of the Bradshaw Joint Venture. However, in the analysis of the Wilsteins' cross-appeal, we reinstate this award, so we do not consider this argument here.

*See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997) (holding that parties waive error regarding failure to segregate attorney's fees by failing to object); *see also* TEX. R. APP. P. 33.1(a).

Furthermore, the evidence at the bench trial indicated that the Wilsteins properly segregated their attorney's fees to limit them only to the recoverable claim. *See Chapa*, 212 S.W.3d at 313. The Wilsteins' attorney and expert on attorney's fees testified that the attorneys all went through their invoices and removed any items that related only to non-recoverable claims. They then went through each item in the invoice and determined what percentage of the remaining fees, if any, would have been necessary even in the absence of the non-recoverable claims. *See id.* at 314. The expert testified that the Wilsteins were seeking approximately 62% of their total fees as attributable to their litigation of the Bradshaw Field claim. The Wilsteins provided both documentary evidence and testimony regarding the type of work done, the professional who completed the work, their hourly rates, the dates on which the work was performed, and how much time the work required. *See El Apple I*, 370 S.W.3d at 764.

Dernick also argues that the fees awarded in this case were not reasonable or necessary because the amount of fees awarded was so high, especially in light of the "minimal" focus on the Bradshaw Field claims during trial. Dernick argues that the high fees resulted from "overwhelming duplication of effort, having

47

multiple attorneys read the massive record (multiple times) from the prior trial, even though the merits of the Bradshaw claim had nothing to do with it, and the focus on Bradshaw was minimal." However, the record demonstrates that, in spite of the Wilsteins' request for more, the trial court awarded them only 30% of their total fees. Furthermore, the Wilsteins' expert acknowledged that the fees in this case were higher than usual, but argued that the high fees were the result of the protracted length of the litigation and the strategic choices made by Dernick to file multiple emergency motions and mandamuses that resulted in high fees to prepare responses on an emergency basis and caused wasted effort preparing for trial settings and other matters that were delayed.

Dernick also argues that "even though the Wilsteins were responsible for a mistrial [in 2012], there was no deduction for any of those fees." However, the record again demonstrates that Dernick failed to ask for segregation on this basis in the trial court. *See Solis*, 951 S.W.2d at 389 (holding that parties waive error regarding failure to segregate attorney's fees by failing to object); *see also* TEX. R. APP. P. 33.1(a). And the record demonstrates that the mistrial was not due to any legal maneuverings on the Wilsteins' part. Rather, it was Dernick that sought the mistrial, which the trial court granted because it believed its own rulings were unclear and wanted to be sure to have a clean trial with a clean record for appeal.

Thus, we conclude that the attorney's fees awarded were reasonable and necessary under the circumstances of this case.

We overrule Dernick's fourth issue.

## II.    THE WILSTEINS' CROSS-APPEAL

### Accounting of Revenues from Bradshaw Joint Venture

In their cross-appeal, the Wilsteins challenge the trial court's decision to disregard the jury's finding of damages regarding revenue generated by the Bradshaw Joint Venture.

### A.    Facts Relevant to the Wilsteins' Issue

The Wilsteins collectively owned a 25% interest in the Bradshaw Field, Dernick owned a 25% interest, and a third party owned a 50% interest. Dernick sold the entire interest to which it held title in the Bradshaw Field, which necessarily included the portion owned by the Wilsteins because Dernick was the record title holder under the JVA. Dernick failed to disclose the sale to the Wilsteins and failed to provide them with the accounting required by the JVA, but it did record the sale in the Kansas real property records. After the sale, the buyer conveyed overriding royalty interests back to Dernick. Dernick likewise failed to disclose the existence of the interests to the Wilsteins and failed to provide an accounting for them or otherwise give the Wilsteins their portion of the proceeds.

In their live pleading at the time of trial,[4] the Wilsteins asserted multiple causes of action, including a cause of action for breach of contractual and fiduciary duties, stating that Dernick was "required to maintain and furnish [the Wilsteins] with accurate records regarding the monthly and cumulative accounting of the expenses incurred in operations, the value of gas produced and marketed, and the revenues [the Wilsteins] were entitled to receive from the Properties," a duty that the Wilsteins alleged was breached. The Wilsteins further contended that Dernick was their "agent in the marketing of gas, the handling of revenues, and in the representation of [the Wilsteins] in litigation filed by Dernick," that Dernick was their fiduciary and owed them fiduciary duties, and that Dernick breached those duties for its own purposes and gains. Several of their specifically enumerated complaints dealt with the failure to pay revenues, including an allegation that Dernick "unlawfully and without authority asserted and assumed dominion and control over [the Wilsteins'] gas and revenues, thereby converting same to [its] use and benefit and also breaching [its] fiduciary and agency duties. . . ."

"Count Seven" of the Wilsteins' live pleading was for a claim "for Breach of Contractual and Fiduciary Duties and Claim for Accounting." Under this cause of action for "an accounting," the Wilsteins pleaded facts related to Dernick's sale of their interest in the Bradshaw Field without notice and without paying them their

---

[4] Their live pleading was their seventh amended petition, which was filed on August 2, 2004, prior to the original trial.

share of the proceeds.  The Wilsteins further alleged that they "ha[d] not received any monies whatsoever representing the value of their collective 25% interest in the assets of lease acquisition costs of initial investment of the Joint Venture, nor [had] the Wilsteins received an accounting of the profits realized from the sale of these properties."  They also alleged that Dernick failed "to properly account for the assets of the Joint Venture" and that Dernick's wrongful acts "resulted in [Dernick's] unjust retention of benefits, properties, profits and proceeds under the Bradshaw Joint Venture Agreement which would have otherwise flowed to the Wilsteins."  In their prayer for relief, the Wilsteins sought "[j]udgment against Dernick for breach of fiduciary and contractual duties related to the Bradshaw Program" and "[j]udgment against Dernick for a sum to be determined in the accounting."

In 2005, the trial court ruled that all of the Wilsteins' claims for breach of fiduciary duties related to the Bradshaw Joint Venture were barred by limitations. This ruling was appealed to this Court, which stated:

> The Wilsteins contend that 'Dernick's failure to properly account for the assets of the Joint Venture . . . and its failure to disclose the sale of the properties, both constitute a breach of its fiduciary duties, and a breach of the terms of the [Bradshaw Field JVA]. . . .'  Again, we agree with the Wilsteins.

*Dernick Res.*, 312 S.W.3d at 884.  Thus, we concluded in our 2009 opinion that Dernick owed the Wilsteins a fiduciary duty under the Bradshaw Field JVA and

51

that Dernick breached its duties to the Wilsteins with regard to the sale of their interest in the Bradshaw Field as a matter of law when it failed to provide them with notice of the sale or proceeds. *Id.* at 884–85. We remanded the case for trial on the claims that the trial court excluded on limitations grounds.

The Wilsteins subsequently filed an expert witness designation and supplement to their responses to Dernick's request for disclosure designating experts to testify to the "lost profits in connection with Dernick's breach of fiduciary duty to the Wilsteins in the remanded Bradshaw claim" and to "[t]he benefits and profits made by Dernick in the Bradshaw transaction as a result of its breach of fiduciary duty to the Wilsteins, including Dernick's commingling of funds belonging to the Wilsteins from the sale of leases to Bradshaw Energy, LLC." The Wilsteins identified an expert who would testify regarding benefits that Dernick retained in the sale of the Bradshaw Field that were not shared with the Wilsteins, and they stated, "It is believed that there may be additional assignments and interests purchased by Dernick that were within the scope of the Bradshaw Joint Venture, and that were not shared with the Wilsteins."

Likewise, Dernick designated an expert to testify regarding the revenue the Wilsteins would have received under the Bradshaw Joint Venture between 1994, when they entered into the JVA, and 1998, when Dernick sold their interest without informing them of the sale or compensating them for their interest. The

Wilsteins deposed this witness, Howard Blunk, in 2011. At that time, Blunk stated that he was originally engaged to determine the net revenue earned by the Wilsteins' interests from the date of the acquisition to the date of the sale but that he was not able to obtain the necessary information to do so.

The Wilsteins also made a disclosure regarding the amount and any method of calculating economic damages by referring to the "second amended expert witness designation and supplement hereto." They stated,

> With respect to the Bradshaw claim, the burden is on Dernick, as the breaching fiduciary, to account to the Wilsteins for their share of the proceeds received from the Bradshaw sale. Absent a full accounting, the Wilsteins are entitled to 25% of the net sales proceeds from the Bradshaw sale.

At trial, the Wilsteins established that they entered into the Bradshaw JVA in 1994, thus obtaining a collective 25% interest in the Bradshaw Field, and that the Bradshaw Field had producing wells from 1994 through 1998 and even in the 2000s. The evidence indicated that Dernick sold its entire title interest in the Bradshaw Field in 1998, which included the Wilsteins' interest because Dernick was the record title holder, for approximately $8.25 million. It is undisputed that it never paid any of those proceeds to the Wilsteins. Dernick also obtained, as part of the sale of the Bradshaw Field interest, an overriding royalty interest.[5] It was

---

[5] "An overriding royalty is an interest in the oil and gas produced at the surface, free of the expense of production." *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 180 n.1 (Tex. 2012).

likewise undisputed that Dernick never paid any portion of that overriding royalty interest to the Wilsteins, even though there was evidence that the Bradshaw Field wells were producing during the relevant time. Dernick did not object to any of the Wilsteins' evidence based on a failure to disclose.

Dernick's expert, Blunk, testified at trial that he could not determine the amount of revenue generated by the Bradshaw Field. Stephen Dernick likewise testified that he did not know "what amount of revenue is attributable to" the Wilsteins' interests in the Bradshaw Field. And Blunk could not provide an accounting for the value of the overriding royalty interest conveyed back to Dernick as part of the sale of the Bradshaw Field. He testified that if there were producing properties there would be revenue, but he could not do an accounting because Dernick had told him the records were not available.

The jury charge asked the jury what sum of money would compensate the Wilsteins for their damages, if any, "that were proximately caused by Dernick's breach of fiduciary duty in failing to notify the Wilstein Brothers about the acquisition of leasehold interests in Greeley County, Kansas, and in failing to account to the Wilsteins Brothers for their share of the assets of the Bradshaw Joint Venture." Dernick objected to the submission of a question on production revenues on the ground that it was not supported by the Wilsteins' pleadings and was barred by their disclosures and that the Wilsteins did not establish what their

production revenues would be. The trial court overruled this objection. Dernick did not object to the jury charge on the ground that lost profits, rather than production revenues, was the proper measure of damages, nor did it provide any alternative measure of damages.

The jury found that the Wilsteins' "share of the sales proceeds of the Bradshaw Joint Venture" was $162,194.14. The jury further found that the Wilsteins' "share of the production revenues of the Bradshaw Joint Venture" was $750,000.

Dernick filed a motion to disregard the jury's finding that the Wilsteins were entitled to $750,000 as their share of the production revenues of the Bradshaw Joint Venture. Dernick argued that the finding must be disregarded because it was unsupported by evidence and because it was immaterial and should never have been submitted due to the Wilsteins' "failure to plead for and disclose such damages." Dernick argued that the submission of that question was barred by Rules 193.6, 278, and 301, and that it challenged the submission of the question based on the Wilsteins' failure to disclose such damages. Dernick also argued, "Assuming, *arguendo*, that the Wilsteins had pleaded for and disclosed their intent to seek damages related to production of oil and gas from the Bradshaw leases," lost profits, not lost revenues, was the proper measure of damages. The trial court granted Dernick's motion to disregard.

**B.    Standard of Review**

The trial court has broad discretion in submitting the jury charge, subject only to the requirement that the questions submitted must (1) control the disposition of the case; (2) be raised by the pleadings and the evidence; and (3) properly submit the disputed issues for the jury's determination. TEX. R. CIV. P. 277, 278; *Moore v. Kitsmiller*, 201 S.W.3d 147, 153 (Tex. App.—Tyler 2006, pet. denied).

Error in the charge must be preserved by distinctly designating the error and the grounds for the objection. *Keetch v. Kroger Co.*, 845 S.W.2d 262, 267 (Tex. 1992); *see* TEX. R. CIV. P. 274. The test for whether a party has preserved error in the jury charge is whether the party made the trial court aware of the complaint timely and plainly and obtained a ruling. *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992).

A trial court may disregard a jury finding if (1) the finding is immaterial or (2) there is no evidence to support one or more of the jury findings on issues necessary to liability. TEX. R. CIV. P. 301; *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). A finding is immaterial when the corresponding question either: (1) should not have been submitted; (2) calls for a finding beyond the province of the jury, such as a question of law; or (3) was properly submitted but has been rendered immaterial by other findings. *Se. Pipe*

*Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999); *Spencer*, 876 S.W.2d at 157.

We review the grant or denial of a motion for judgment notwithstanding the verdict or a motion to disregard jury findings as a legal-sufficiency challenge. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). In conducting a legal-sufficiency review, we credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827; *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex. App.—Houston [1st Dist.] 2007, no pet.). We consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822. We sustain a no-evidence contention only if: (1) the record reveals a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810; *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

## C. Analysis

Here, Dernick argues that the trial court should disregard the jury's finding regarding production revenues for the Bradshaw Field because the question is

immaterial and because no evidence supports the finding. Specifically, Dernick argues that the question is immaterial because it should not have been submitted—the Wilsteins' pleadings did not properly raise the question of whether they were entitled to any damages beyond their share of the proceeds from the sale of the field.[6] Dernick argues that the Wilsteins' pleadings only sought recovery of their share of the proceeds of the sale of the Bradshaw Field and that they never mentioned "production revenues" in their pleadings or disclosures.

The Wilsteins' pleadings and disclosures focused on the loss of sales proceeds arising from Dernick's sale of its interest in the Bradshaw Field. This Court's 2009 opinion overturned the trial court's judgment in the case as originally pleaded and tried. We concluded:

> Dernick breached its fiduciary duty to the Wilsteins by failing to disclose its sale of their interest in the Bradshaw Field and that the Wilsteins were not put on constructive notice of the sale by the filing of the sale in the Kansas public records. The trial court found that the Wilsteins discovered the sale of their interest in the Bradshaw Field following the 2002 audit of that field. This finding is supported by the evidence. Because the Wilsteins filed their Bradshaw Field claims in 2003, their claims were not barred by the four-year statute of limitations for breach of fiduciary duty and fraud.

---

[6] Dernick also argues that the Wilsteins failed to disclose such a measure of damages. However, Rule of Civil Procedure 193.6, which Dernick cites as authority here, does not deal with submission of questions to the jury. Rather, it provides that the remedy for failing to disclose evidence or witnesses is exclusion of that evidence. *See* TEX. R. CIV. P. 193.6. Dernick does not point to any specific evidence that should have been excluded for this reason. Thus, this argument is unavailing.

*Dernick Res.*, 312 S.W.3d at 885. Thus our opinion and mandate remanded the claim for breach of contractual and fiduciary duties arising out of Dernick's sale of the Wilsteins' interest in the Bradshaw Field because the trial court had erred in excluding trial of these claims on limitations grounds. Our opinion did not address the Wilsteins' right to any production revenues for the time between when they entered into the Bradshaw Field JVA in 1994 and when Dernick sold the interest in 1998. That is, our opinion did not address damages for which Dernick might be held liable on remand. It is undisputed that the "share of the sales proceeds of the Bradshaw joint venture" constituted a measure of the Wilsteins' damages. Thus, we must determine whether "production revenues" could also be a measure of damages for Dernick's breach of contractual and fiduciary duties on retrial.

The Wilsteins' pleadings and the evidence at trial indicated that their damages went beyond their share of the sales proceeds. It was established that, as part of the sale, Dernick obtained an overriding royalty interest. Dernick never paid any portion of this overriding royalty to the Wilsteins, despite the fact that it obtained the royalty in part by selling the Wilsteins' interest in the Bradshaw Field. An overriding royalty interest can be considered "production revenues." *See Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 180 n.1 (Tex. 2012) ("An overriding royalty is an interest in the oil and gas produced at the surface, free of the expense of production."). We conclude that the question

59

regarding damages beyond the sales proceeds for breach of contractual and fiduciary duties is controlling and was raised by the pleadings and the evidence.

Dernick argued in the trial court that "production revenue" was not the proper measure of damages. However, Dernick did not argue in the trial court that some alternate method of determining these damages should have been submitted. It did not offer any alternative instruction to address these damages. Therefore, this objection is waived. *See* TEX. R. CIV. P. 274; *Keetch*, 845 S.W.2d at 267; *Payne*, 838 S.W.2d at 241.

Dernick also argues that the Wilsteins presented no evidence supporting their right to production revenues in any amount. Dernick further argues on appeal that the evidence of production revenue is factually insufficient and the award was "excessive" and "manifestly too large." However, Dernick's argument mischaracterizes the evidence. The record indicates that Dernick sold the 50% interest it held in the Bradshaw Field, including its own 25% interest and the Wilsteins' 25% interest, for $8.25 million in 1998 and that it also obtained an overriding royalty interest in the field as part of that transaction. The record also demonstrated that there was production of hydrocarbons in that field as recently as 2009. Thus, there is evidence on which a fact finder could rely to conclude that production revenues were paid to Dernick in the eleven years between 1998 and

2009 and that the Wilsteins, by virtue of their 25% interest, were entitled to some portion of that money.

Dernick, as the breaching fiduciary, bore the burden of providing more specific information regarding the revenues generated by the royalty it obtained by selling the Wilsteins' interest in the Bradshaw Field. Thus, we find this case similar to *Thompson v. Duncan*, 44 S.W.2d 904 (Tex. Comm'n App. 1932, judgm't adopted). There, the court considered the failure of a joint venture and stated:

> When the [fiduciary] was called upon by letter for specific information, which he as a trustee was under a solemn duty to furnish his associates in this enterprise, he wholly ignored their request. He declined to permit an inspection of his books after promising to do so. When this case was called for trial he absented himself and did not offer any evidence whatever. Although [the plaintiffs] offered evidence on the trial tending to show that other sales had been made by [the fiduciary] since the filing of his purported report, yet no report covering same was made up to the time of the trial, and [the fiduciary] declined to make any showing upon the trial which would in any way tend to excuse or justify his conduct. We can hardly imagine a state of facts which would show a more flagrant disregard of the rights of the members of the joint enterprise by the man who was designated as trustee to conduct its operations. . . .
>
> But it is argued by [the fiduciary] that [the plaintiffs] produced no proof upon the trial showing injury to them by reason of his failure to make the reports required by the contract. We think, as before stated, there were sufficient circumstances shown to justify an inference that [the fiduciary] had made sales of lots not covered by his report. Even if this were not true, [the fiduciary], resting under the solemn duty of furnishing his associates with full information in regard to all transactions had in the common enterprise, and having failed and refused to do so, is in no position to complain of the insufficiency of the showing made by them as to injury.

*Thompson*, 44 S.W.2d at 908.

The facts here are similar. The Wilsteins sought an accounting from Dernick regarding these revenues, but Dernick never provided one. At trial, Stephen Dernick testified that he had no way of accounting for any revenues that might be due to the Wilsteins. However, the Wilsteins presented evidence that Dernick obtained some sort of revenues, in the form of its overriding royalty interest on a field that was known to be producing. Dernick, as the fiduciary, owed "the solemn duty of furnishing [its] associates with full information" in regard to this transaction and, "having failed and refused to do so, is in no position to complain of the insufficiency of the showing made by them as to injury." *See id.*

We cannot conclude that the jury's finding on this issue was immaterial or that there is no evidence to support it. *See* TEX. R. CIV. P. 301; *Spencer*, 876 S.W.2d at 157. Accordingly, the trial court erred in disregarding the jury's finding.[7]

We sustain the Wilsteins' issue and reinstate the jury's finding, including pre-judgment interest.

---

[7] The Wilsteins have agreed to waive their right to remand to recalculate attorney's fees if this Court determines that rendering judgment is the proper disposition on appeal. We have concluded that we will modify the judgment and affirm it as modified, so we will not remand for recalculation of attorney's fees.

62

**Conclusion**

We modify the trial court's judgment to reinstate the jury's award to the Wilsteins of $750,000 for damages relating to production revenues and $365,924.26 for prejudgment interest on that claim.[8] We affirm the judgment as modified.


Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

---

[8] The calculation of prejudgment interest is governed by Financial Code section 304.003. *See* TEX. FIN. CODE ANN. § 304.003(c)(2) (Vernon 2006) (providing accrual rate for post-judgment interest); *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 532 (Tex. 1998) (holding that prejudgment interest accrues at same rate as post-judgment interest). The interest rate is 5% simple interest, and the interest is calculated from the date the Wilsteins filed their claims against Dernick on October 8, 2003, until the date of the final judgment on July 8, 2013. This amounts to $365,924.26.